[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-12308

_____

Agency No. A087-357-419

JAMELLA MARIE TENEILLE LEWIS,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(March 14, 2013)

Before O'CONNOR,[*] Associate Justice Retired, and MARCUS and PRYOR,
Circuit Judges.

PER CURIAM:

Jamella Lewis, a native and citizen of Trinidad and Tobago, petitions for

review of a decision of the Board of Immigration Appeals that affirmed the denial

_____

[*] Honorable Sandra Day O'Connor, Associate Justice (Retired) of the United States Supreme
Court, sitting by designation.

of her application for withholding of removal by an immigration judge.  Lewis left

Trinidad when she became pregnant after being repeatedly raped by her former

boyfriend, Kareem Griffith, who has since threatened Lewis and her family

members on several occasions.  Lewis argues that the Board erred when it

determined that she was not entitled to withholding of removal because she had

failed to establish that it was more likely than not that she would suffer persecution

by Griffith if she returned to Trinidad.  Lewis also argues that the immigration

judge erred by failing to inform her that she appeared to be eligible for voluntary

departure.  We conclude that substantial evidence supports the decision of the

Board.  The Board was entitled to conclude that Lewis failed to prove that the

government of Trinidad was unwilling or unable to protect her because Lewis

presented evidence that Trinidadian authorities enforce laws against rape.  But the

Board failed to address whether the immigration judge was required to inform

Lewis that she appeared to be eligible for post-hearing voluntary departure.  We

deny in part Lewis's petition with regard to her application for withholding of

removal, grant in part Lewis's petition with regard to her argument that the

immigration judge should have informed her about voluntary departure, vacate the

decision of the Board, and remand for further proceedings.

## I. BACKGROUND

2

Jamella Lewis is a native and citizen of Trinidad and Tobago and lived there until she was 14 years old. She was admitted to the United States as a non-immigrant visitor on May 8, 2004, and permitted to remain here until November 7, 2004, but she remained in the United States beyond that deadline.

In 2008, Lewis filed an application for asylum. The Department of Homeland Security then issued a notice to appear that charged Lewis with being subject to removal. At a hearing, Lewis conceded her removability, but renewed her application for asylum on the ground that she would be persecuted by Griffith if she returned to Trinidad.

At the removal hearing, Lewis, her father, Hugh, and her sister, Janille, all testified in support of her application. Their testimony established that Lewis's mother died when Lewis was 13 years old. Lewis had been close to her mother, but after her mother's death she distanced herself from her family. Meanwhile, Griffith, a gang leader who was seven years older than Lewis, pursued a relationship with her. Lewis knew that Griffith was a leader in a gang, was involved in drug dealing, and had bragged that he had killed someone without being caught. Lewis believed that Griffith might hurt her if she ignored him.

Every week after school for a four month period, when Lewis was 14 years old, Griffith took her to his home and raped her. When Lewis learned that she was pregnant, Griffith insisted that Lewis abort the child, and he forced her to consume

3

liquids and pills intended to induce an abortion. Griffith also threatened to terminate Lewis's pregnancy by beating her.

Lewis's aunt learned of the pregnancy and told Lewis's father, Hugh. After learning about the pregnancy, Hugh allowed Lewis to leave home only to attend school. Hugh also confronted Griffith, who told him that he had a gun and was not afraid to use it.

After Griffith threatened him, Hugh sent Lewis to live in Florida. From 2004 until she filed her application for asylum in 2008, Lewis lived with various family members and friends and at women's shelters in the United States. During this time, Lewis gave birth to the child she conceived with Griffith, a daughter she named Jade. She also conceived and gave birth to a second daughter, Jayana, who was fathered by another man.

While in the United States, Lewis had occasional telephone conversations with Griffith, who became increasingly threatening. Griffith eventually learned that Jade was in Trinidad living with Hugh. Griffith then threatened Lewis that he would tie up Hugh and kidnap Jade. Lewis then feared for Jade's safety and returned her to the United States.

Lewis testified that she fears that, if she returns to Trinidad, Griffith will harm her, her children, or her father. She believes that she will be forced to join Griffith's gang and that he will abuse Jayana because he is not Jayana's father.

4

Lewis does not believe that the police can protect her because they take too long to investigate crimes of domestic violence.

Hugh testified that Griffith told him that he lived a criminal lifestyle and that the police were powerless to stop him. Hugh saw Griffith one or two times after Lewis came to the United States. Griffith pointed his finger at Hugh to simulate pointing a gun and said that he would kill Lewis. Hugh also testified that he reported his daughter's rape to the police, but the police responded that they were unable to investigate the rape while Lewis was not in Trinidad.

Lewis's sister, Janille, testified that Griffith, on several occasions, threatened to kill her, Lewis, and Hugh. When Janille reported these encounters to police, they notified her that nothing could be done because they could not find Griffith. Janille believes that, if Lewis returns to Trinidad, Griffith will kill her entire family.

Lewis submitted the 2009 State Department Human Rights Report for Trinidad and Tobago, which stated that rape and sexual abuse against women and children continued to be a significant problem in Trinidad. The report stated that rape is illegal and punishable by up to life imprisonment and that the police had stated that in 2009 there were 231 cases of rape, 71 prosecutions and convictions, and 326 pending investigations. The report also described the legal tools available for the protection of women from domestic violence, but stated that enforcement

5

by the police was lax.  The report also stated that many instances of rape were not reported based on the perceived insensitivity of law enforcement.

Lewis also submitted a 2008 report from the United Nations High Commission for Refugees entitled "Trinidad & Tobago: Domestic violence, including legislations, services available and police response to complaints (2005–2008)."  The United Nations report discussed the Domestic Violence Act of 1999, which requires the police in Trinidad to investigate all reports of domestic violence and permits courts to grant interim protection orders before a hearing is held.  But the report also stated that enforcement of these protections was lax.  The report referenced several instances of indifference or inadequacy on the part of police and described the resources available for victims of domestic abuse, but the report stated that many resources had been allowed to collapse.  The United Nations report did not address other kinds of sexual assault.

The immigration judge denied Lewis's application for asylum and withholding of removal.  The immigration judge determined that Lewis was ineligible for asylum because her application for asylum was untimely.  The immigration judge also ruled that Lewis had failed to establish that Trinidad was unable or unwilling to protect her, had failed to establish a well-founded fear of future persecution, and had failed to prove that she was subject to persecution based on membership in a particular group.  The immigration judge found that

recent developments in the law of Trinidad, including the Domestic Violence Act of 1999, provided increased protection to victims of domestic abuse and suggested that the government of Trinidad was willing and able to protect Lewis.  The immigration judge also found that Lewis's father, Hugh, and sister, Janille, remained in Trinidad unharmed.

Lewis appealed the decision of the immigration judge to the Board of Immigration Appeals, which affirmed.  The Board agreed with the immigration judge that Lewis could not establish that she was subject to persecution based on a protected ground.  The Board also ruled that Lewis had not established that Trinidad was unable or unwilling to protect her.  The Board relied on the discussion of the Domestic Violence Act in the United Nations report to support this decision.  The Board ruled that, because Lewis could not establish that she was entitled to asylum, she also could not meet the higher burden for withholding of removal.

## II.  STANDARD OF REVIEW

"When the [Board] issues a decision, we review only that decision, except to the extent the [Board] expressly adopts the [decision of the immigration judge]." Chacon-Botero v. U.S. Att'y Gen., 427 F.3d 954, 956 (11th Cir. 2005).  "We review de novo the conclusions of law by the Board . . . ."  Kazemzadeh v. U.S. Att'y Gen., 577 F.3d 1341, 1350 (11th Cir. 2009).  We "review[] administrative

7

fact findings under the highly deferential substantial evidence test.  Under the substantial evidence test, we view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision."  Adefemi v. Ashcroft, 386 F.3d 1022, 1026–27 (11th Cir. 2004) (en banc) (internal citations omitted).  "We must affirm the [Board's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole."  Id. at 1027 (internal quotation marks omitted).  "[F]indings of fact made by administrative agencies, such as the [Board], may be reversed by this [C]ourt only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings."  Id.

## III.  DISCUSSION

We divide our discussion in two parts.  First, we discuss whether substantial evidence supports the denial of Lewis's application for withholding of removal.  Second, we discuss whether the immigration judge should have informed Lewis that she appeared to be eligible for voluntary departure.

### A.  Substantial Evidence Supports the Denial of Lewis's Application for Withholding of Removal.

An alien who applies for withholding of removal bears a well-established burden of proof.  The applicant must prove that "the alien's life or freedom would be threatened in [her home] country because of the alien's race, religion,

8

nationality, membership in a particular social group, or political opinion." 8

U.S.C. § 1231(b)(3)(A). "The alien bears the burden of demonstrating that it is

'more likely than not' she will be persecuted or tortured upon being returned to her

country." Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1375 (11th Cir. 2006) (quoting

Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1232 (11th Cir. 2005)).

"An applicant for withholding of removal may satisfy her burden of proof in

either of two ways. First, an alien may establish 'past persecution in [her] country

based on a protected ground.'" Id. (quoting Mendoza v. U.S. Att'y Gen., 327 F.3d

1283, 1287 (11th Cir. 2003)). "If an alien establishes 'past persecution,' a

rebuttable presumption arises that she has a 'well-founded fear of future

persecution,' and the burden then shifts to the Department of Homeland Security to

show that the conditions in the country have changed or the alien could avoid a

future threat through relocation." Id. "Second, an alien is entitled to withholding

of removal if she establishes 'that it is more likely than not that [] she would be

persecuted on account of race, religion, nationality, membership in a particular

social group, or political opinion upon removal to that country.'" Id. (quoting 8

C.F.R. § 208.16(b)(2)). When an alien alleges persecution by a private actor, the

alien "must prove that h[er] home country is unable or unwilling to protect h[er]."

Ayala v. U.S. Att'y Gen., 605 F.3d 941, 950 (11th Cir. 2010); see also Matter of

Acosta, 19 I & N Dec. 211, 222 (BIA 1985), (interpreting "persecution" to require

9

"harm or suffering . . . inflicted either by the government of a country or by persons . . . that the government was unable or unwilling to control"), overruled in part on other grounds by Matter of Mogharrabi, 19 I & N Dec. 439 (BIA 1987).

Substantial evidence supports the decision of the Board that Lewis's failed to prove that Trinidad was unwilling or unable to protect her. The record establishes that Trinidadian authorities enforce laws against rape. The 2009 State Department Report, which Lewis introduced, stated that, out of 231 cases of rape that year, 71 led to prosecutions and convictions. And 326 investigations of rape were ongoing at the end of the year. Lewis's father, Hugh, testified that, when he reported Lewis's rape to the police, they explained that they could not investigate her rape because she was not in Trinidad to assist them. That testimony together with the State Department Report allows a reasonable inference that the police were willing and able to investigate Lewis's rape if she were available to assist them. The United Nations Report does not address all forms of rape, but it states that the Trinidad and Tobago Domestic Violence Act of 1999 enhanced existing laws on domestic violence, required police officers to respond to all complaints or reports of domestic violence, and allowed courts to grant interim protection orders without a hearing. The decision of the Board that Lewis failed to prove that Trinidad is unwilling or unable to protect her "is supported by reasonable,

10

substantial, and probative evidence on the record considered as a whole."
Adefemi, 386 F.3d at 1027 (internal quotation marks omitted).

Lewis cites evidence that the enforcement of Trinidadian laws against domestic violence has been lax, but the record is far from clear that Lewis's alleged rape by the leader of a local gang is the kind of crime that Trinidadian authorities have been slow to investigate or punish. The ordinary meaning of domestic violence is "[v]iolence between members of a household," not the rape of a minor by an unrelated adult who does not live with the victim. Black's Law Dictionary 1705 (9th ed. 2009). The evidence presented by Lewis about rape, outside the context of domestic violence, mentioned only a "perceived insensitivity on the part of police." The finding by the Board that Lewis failed to prove that Trinidad is unwilling or unable to protect her "may be reversed by this [C]ourt only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." See id. We must defer to the finding by the Board that Lewis failed to prove that Trinidad was unwilling or unable to protect her "unless there is no reasonable basis for that decision," id. at 1029, and the record "compels a reversal," id. at 1027.

The record does not compel a conclusion contrary to the finding by the Board. Because Lewis failed to prove that Trinidad was not willing and able to

11

protect her, her argument that she established past persecution fails.  And because

Lewis cannot prove that she would likely suffer from persecution, we need not

address whether she has established that she is a member of a protected group.

### B. *The Board Failed to Address Whether the Immigration Judge Should Have Informed Lewis that She Appeared to Be Eligible for Voluntary Departure.*

Lewis argues that the immigration judge erred by failing to advise her that

she might be eligible for voluntary departure.  Voluntary departure permits an alien

to leave the United States at her own expense instead of being removed.  See 8

U.S.C. §§ 1229c(a), (b).  An alien may seek either pre-hearing or post-hearing

voluntary departure.  See id.   The Board did not address whether the immigration

judge should have informed Lewis that she appeared to be eligible for either form

of voluntary departure.

Lewis argues that we should remand for consideration of whether she is

eligible for pre-hearing voluntary departure, but Lewis cannot establish that she

was prejudiced by the failure of the immigration judge to inform her that she

appeared to be eligible for pre-hearing voluntary departure.  An immigration judge

is required by regulation to "inform [an] alien of his or her apparent eligibility to

apply for any of the benefits enumerated in [the Immigration and Nationality Act]

and [] afford the alien an opportunity to make application during the hearing."  8

C.F.R. § 1240.11(a)(2).  With regard to pre-hearing voluntary departure, the Board

has explained that "[a]n [i]mmigration [j]udge has a duty to inform aliens of

12

potential forms of relief for which they are apparently eligible, including voluntary departure." Matter of Cordova, 22 I & N Dec. 966, 970–71 (BIA 1999).   But to be granted pre-hearing voluntary departure, an alien must request voluntary departure at or before the master calendar hearing, make no additional requests for relief, concede removability, and waive appeal of all issues. See 8 C.F.R. § 1240.26(b)(1)(i).  Lewis's description of the issue of prejudice as "whether she would seek voluntary departure as an alternative form of relief following the conclusion of proceedings" suggests that she would have been unwilling to forego immigration proceedings to obtain pre-hearing relief.

Although the Board has never held that an immigration judge must inform an alien that she appears to be eligible for post-hearing voluntary departure, 8 C.F.R. § 1240.11(a)(2), a recent decision of the Board suggests that an immigration judge might be required to discuss eligibility for post-hearing voluntary departure with an alien. See Matter of C-B-, 25 I & N Dec. 888, 892 (BIA 2012).  In Matter of C-B-, the Board ruled that, after an immigration judge withdraws a grant of pre-hearing voluntary departure because an alien is no longer eligible for pre-hearing voluntary departure, the alien's "eligibility for [post-hearing] voluntary departure . . . should [] be[] considered at the conclusion of the hearing."  25 I & N Dec. at 892.  The Board relied on its precedent in Matter of Cordova that an immigration judge must inform an alien about pre-hearing voluntary departure. Id. at 891.  But

13

the Board also limited its decision to "the circumstances [of that] case," id. at 892, which included that the "[i]mmigration [j]udge [had] initially granted the respondent [pre-hearing] voluntary departure," id. at 891.  Because there is no Board precedent directly addressing whether an immigration judge must inform an alien of apparent eligibility for voluntary departure, we grant the petition with respect to this issue, vacate the decision of the Board, and remand the matter for the Board to address whether the immigration judge should have informed Lewis that she appeared to be eligible for post-hearing voluntary departure.

## IV.  CONCLUSION

We **DENY** in part Lewis's petition for review with regard to her application for withholding of removal and **GRANT** in part her petition with regard to Lewis's argument that the immigration judge should have informed her that she appeared to be eligible for post-hearing voluntary departure.  We **VACATE** and **REMAND** for further proceedings.