[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-12762
Non-Argument Calendar
_____

Agency No. A205-088-827

LUIS FERNANDO VALDERRAMA HERNANDEZ,
MAGNOLIA GOMEZ RUBIO,

                                                                        Petitioners,

versus

U.S. ATTORNEY GENERAL,

                                                                        Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(December 14, 2015)

Before MARCUS, WILLIAM PRYOR, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Luis Fernando Valderrama Hernandez ("Luis") and Magnolia Gomez Rubio

("Magnolia") (collectively, "Petitioners"), spouses and natives and citizens of

Colombia, petition this Court for review of the denial of Luis's application for asylum. An immigration judge ("IJ") denied Luis's application on the basis that he failed to meet his burden of proof by not providing reasonably available evidence to corroborate his credible testimonial account of being persecuted by the Revolutionary Armed Forces of Colombia ("FARC") for aiding a local civic organization. Luis appealed to the Board of Immigration Appeals ("BIA"), which affirmed based on the lack of corroborative evidence. Luis and Magnolia now bring this petition for review, arguing that Luis's credible testimony and other documentary evidence were sufficient to establish his eligibility for asylum and that the IJ and BIA improperly applied the corroboration standard under 8 U.S.C. § 1158(b)(1)(B)(ii).

## I.

Luis and Magnolia last entered the United States in May 2011 as non-immigrant visitors. After entry, Luis applied for asylum on the ground of membership in a particular social group, listing Magnolia as a derivative beneficiary. Following an interview on Luis's application, Luis and Magnolia were charged as removable for having remained in the United States for a time

longer than permitted.    *See* 8 U.S.C. § 1227(a)(1)(B).    They conceded removability, and Luis renewed his asylum application.[1]

An IJ conducted a hearing on Luis's asylum application, at which Luis and Luis's treating psychologist testified.    At the beginning of the hearing, the petitioners' counsel indicated that Magnolia was present in the courtroom, but counsel stated that she did not plan to call Magnolia as a witness.

*A. Hearing Testimony*

In support of his application for asylum, Luis testified as follows.    He was born in 1966 in Colombia.    For the past ten years, he had been a self-employed accountant.    In 2006, Luis began working *pro bono* for the Avanti Foundation in Cali, Colombia, where he lived at the time.    The Avanti Foundation educated low-income community members and provided them with needed medical and legal services.    Through his work there, he taught heads of households and youths between the ages of fifteen and twenty how to start their own small businesses, among other things.

In January 2010, Luis began receiving calls on his cell phone from self-identified members of the FARC.    They told him to stop working for the Avanti

---

[1] Luis also raised before the agency claims for withholding of removal, *see* 8 U.S.C. § 1231(b)(3), and protection under the United Nations Convention Against Torture, 8 C.F.R. § 208.16(c).    The petitioners on appeal have abandoned any argument as to those claims by not discussing them in their appellate brief.    *See Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (noting that an issue is abandoned when a petitioner fails to offer argument on it).

Foundation because, by promoting what the FARC viewed as capitalism, he was pushing youths away from communism and thereby harming the FARC's recruitment. Luis received more than four or five similar calls, always from a male. In May 2010, the caller threatened Luis's wife, stating that the caller knew who she was and where she worked. After that call, he and Magnolia decided to move to Bogotá at the end of May. They did not tell anyone they were leaving.

Luis stated that he did not report the phone calls to authorities because there was a "major" risk that the authorities could be connected with the FARC members, and that they would respond to his complaint by having him beaten, kidnapped, or killed. He did not trust the authorities in Colombia.

In Bogotá, Luis continued to teach for the Avanti Foundation over the Internet. In March 2011, he received a phone call from the FARC stating that it had found him in Bogotá. Luis told the head of the Foundation, Pastor Candelaria Hernandez, that he was having problems with the FARC.

On March 30, 2011, Luis was kidnapped by the FARC. He was in Bogotá getting some food when three men approached him from the back, threatened him with a gun, and forced him into a taxi. They told him that they were going to hold a military trial and then kill him because he had not stopped teaching capitalism. In the taxi, he was forced to change clothes and to take three pills, which caused him to black out. At dawn the following day, he awoke dizzy and weak in a new

4

car with the same men. His captors drove to a mountainous area, which seemed to be a "coffee zone," where he was forced to get out of the car. They tied his hands behind his back with a chain. He was given over to a group of men wearing military clothing and armbands identifying them as members of the FARC.

After he was transferred to the men in military uniforms, Luis was forced to walk for nearly twelve hours straight without food. That evening, they arrived at a place where he was tied to tree, standing, where he stayed until morning. They left at dawn and walked another full day. Luis was beaten at some point and was not fed. When they arrived at their destination, Luis was tied to a tree again, but allowed to rest on a piece of plastic. He was told he had to wait for the commander. At first he was just given water. On the fourth day, he was given rice. On the fifth day, a sub-commander told him that he had to continue to wait but that a military trial was going to be held and then he would be killed. Luis stated that he needed his blood-pressure medication, but he was told that it was good he suffered.

Luis was held captive for around fourteen days. By the end of his captivity, he was covered in insect bites and his feet were swollen, as they accumulated liquid without his blood-pressure medication. He lost consciousness, and when he woke up, he was at the house of a farmer. The farmer stated that he found Luis on

5

one of the nearby roads.  The farmer helped him to obtain transportation back to Bogotá later that day.

When Luis arrived back in Bogotá on April 15, 2011, he called his wife, Magnolia, and they went to a hotel.  At the hotel, they decided to leave Colombia for the United States, believing it would be the safest place for them.  They bought plane tickets and left Colombia on April 18, 2011.  Luis and Magnolia did not report Luis's kidnapping to the authorities because he was traumatized from the experience, and Magnolia was afraid that, if they reported the kidnapping, the FARC would find out and kill him.  Luis received psychological counseling in the United States for the traumatic experience.  He was prescribed an anti-depressant to address wishes of dying.  He believed he would be killed if he returned to Colombia.

On cross-examination and in response to questioning from the IJ, Luis testified to the following:  He and Magnolia had family in the Cali area, but they did not notify family that they left for Bogotá because they did not want to worry them or put them in danger.  When they left Cali, Luis transferred all of his business clients to an accountant friend in the area.  Luis guessed that the FARC released him from captivity because, given his poor physical condition and unconscious state, they probably believed he was dead.  The farmer found a bag of Luis's clothes next to him on the roadside, which also contained his identification

6

credentials and wallet without any money inside.  Magnolia's brother, a criminal attorney in Bogotá, helped them find a hotel upon Luis's return to Bogotá and prompted them to take pictures of Luis's injuries.  No one else in the foundation had been kidnapped, but the other professionals were doctors and psychologists.

A clinical psychologist testified that he had been treating Luis for post-traumatic stress disorder since April 2012.  Luis was referred to him by the Physicians for Human Rights Association, and he accepted the case *pro bono*.  The last time he saw Luis was December 26, 2012, about two weeks before the merits hearing.  Due to Luis's kidnapping, the psychologist stated, Luis suffered from severe depression, severe anxiety, despair, recurring nightmares, and extreme fear of being abducted again.

### B. Documentary Evidence Submitted to the IJ

Luis submitted various documents in support of his asylum application. Among other materials, Luis submitted the following:  (a) a letter from Magnolia's brother, who stated that he had met with Luis in Panama City on May 24, 2011, to help set Luis's affairs in Colombia in order;  (b) a letter from a Bogotá hotel official stating that Luis and Magnolia stayed at a certain hotel from April 15–18, 2011;  (c) a letter from Magnolia's employer, which stated that the employer was notified of Luis's abduction on April 19, 2011, when Magnolia called its office; and (d) a letter from the head of the Avanti Foundation stating that Luis had been

forced to leave Cali for Bogotá "for his personal safety because of threats from the FARC," and that, in late April 2011, "[Luis] communicated by telephone that he was out of the country because he had been the victim of abduction from March 30 of 2011 until April 15, 2011."

### C.  Closing Arguments and the IJ's Decision

In closing arguments to the IJ, Luis's counsel argued that Luis testified credibly and that his testimony established past persecution.  The government responded that its "biggest concern" in this case was "the nexus to a protected ground."  According to the government, the only evidence that Luis was kidnapped by the FARC was his own testimony.  But Luis's application, the government contended, was "lacking the corroboration as to the fact that it was the FARC . . . and why they would have a reason to harm him," such as police reports or other documents or messages from the FARC.  The government suggested his kidnapping could have been the result of some other "criminal entity."

The IJ denied Luis's application for relief and ordered that Luis and Magnolia be removed to Colombia.  After summarizing the testimony from the hearing, the IJ first determined that Luis was a credible witness, as his testimony was directly responsive to the questions asked, there were no apparent inconsistencies in his testimony, and he was very emotional when describing the events that happened.

8

Nevertheless, the IJ stated, "this is a REAL ID Act case . . . and the respondent has failed to adequately corroborate his case to show a nexus for one of the five grounds for asylum" and therefore failed to meet his burden of proof. The IJ found that Luis provided no documentation to support his testimony that he was targeted by the FARC for his work with the Avanti Foundation. The IJ found it "alarming" that, despite being threatened and then kidnapped, Luis and Magnolia did not file a police report or otherwise report these events to authorities. The IJ noted Luis's testimony that he was fearful of the police, but stated that "the fact of the matter is that he was kidnapped and there is no report filed." "[I]t is not plausible," the IJ stated, "that someone would disappear and no report be filed."

The IJ found that the "most glaring omission" of corroborating evidence was the absence of any testimony or letter from Magnolia. She would have been, the IJ stated, "the most persuasive witness" because she was there when Luis received threatening phone calls and when he returned from the kidnapping, and "there is simply no account in the record as to why his wife would not go and file a police report." The IJ asserted that there was nothing in the record to show that she knew that the FARC had kidnapped Luis, so the IJ was "left to speculate what she was thinking when he did not come home for 15 days."

The IJ also found that Luis "has failed to provide other evidence which could have been helpful in this case," such as letters from family members, a letter

9

from the accountant in Cali who took over his clients when he moved to Bogotá, or evidence of medical treatment after the kidnapping.

The IJ reiterated that he found Luis to be credible and that he believed that Luis had suffered. Moreover, the IJ stated, had Luis established the requisite nexus, "being kidnapped for 15 days and suffering would amount to past persecution." But, according to the IJ, it was "difficult to understand" why he was targeted by the FARC, why he would have been kidnapped, and why he was left on the side of a road with his belongings if the FARC intended to kill him. In addition, the IJ found that there was "no evidence in the record" that Luis was promoting capitalism and viewed by the FARC as being opposed to communism.

Due to the weakness of Luis's testimony as to the nexus requirement, the IJ found, it was reasonable to expect corroborative evidence that was not presented, such as Magnolia's testimony, police reports, medical evidence, "or any other potential evidence which would show that he was targeted on one of the five enumerated grounds." Because Luis had not presented such evidence, the IJ found that he "failed to corroborate his case" with respect to the nexus requirement. The IJ also found that Luis did not provide any evidence that the FARC had continued to look for him after his departure or that he would be targeted should he return to Colombia. As a result, the IJ denied Luis's asylum application and ordered his and Magnolia's removal.

10

### D. Appeal to the BIA and the BIA's Decision

Luis and Magnolia appealed the IJ's decision to the BIA.  They argued that Luis's clear, consistent, and credible testimony, along with the other evidence submitted, established past persecution on account of an imputed political opinion because of his work with the Avanti Foundation.  They also contended that the IJ erred by effectively requiring Luis to submit evidence directly identifying his kidnappers as the FARC and by relying on the petitioners' failure to file a police report.  The government moved for summary affirmance, citing discrepancies in Luis's testimony, the purported implausibility of his claims, and the lack of sufficient evidence corroborating his testimony.

The BIA dismissed the appeal and affirmed the IJ's decision.  In doing so, the BIA disagreed that Luis's testimony was sufficient to establish his claim for asylum because "the Immigration Judge, as trier of fact, had the authority to request that further corroboration be supplied," pursuant to 8 U.S.C. § 1158(b)(1)(B)(ii).  The BIA explained,

> The Immigration Judge determined that the corroborating evidence presented by the respondent was not sufficient to sustain his burden of proof.  The Immigration Judge supported this determination by pointing to evidence which could have been reasonably presented, such as evidence from [Magnolia].  The Immigration Judge noted that [Magnolia] did not file a missing persons report even though [Luis] had been gone for 15 days.  The Immigration Judge also considered the lack of letters or

11

> affidavits from other family members or evidence of the
> medical treatment he received after the kidnaping.

In addition, the BIA stated that, in light of its disposition of the matter "based on the Immigration Judge's finding regarding corroboration and the lack of a requisite nexus," it was unnecessary to discuss the petitioners' "other appellate arguments relating to persecution."

Luis and Magnolia timely petitioned this Court for review. On appeal, the petitioners contend that Luis's testimony, which the IJ found to be credible, sufficiently established his claim of asylum relief. Luis, they contend, credibly testified that it was the FARC who kidnapped him and that the reason he was kidnapped was because of his work for the Avanti Foundation. They assert that the "corroborating" evidence the IJ required would have tended to prove only whether he was, in fact, kidnapped, but it would have had little or no probative value as to nexus. The IJ's reasoning, they claim, is inconsistent and unclear, making it impossible to meaningfully review the IJ's and the BIA's decisions. Luis and Magnolia further contend that the IJ cannot require corroborating evidence that is not available or discount credible testimony for lack of corroboration without first finding that such evidence is available, and that the IJ failed to give notice to Luis of the need for corroboration and an opportunity to either provide the evidence or explain why he cannot do so.

12

## II.

We review only the BIA's decision as the final judgment, except to the extent it expressly adopts an IJ's opinion or reasoning. *Zhu v. U.S. Att'y Gen.*, 703 F.3d 1303, 1307 (11th Cir. 2013). Where the BIA decision "explicitly agreed" with the IJ's factual findings, we review both the IJ's and BIA's decisions on those issues. *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 947-48 (11th Cir. 2010).

We review administrative fact findings under the substantial-evidence test. *Id.* at 948. Under the substantial-evidence test, we must affirm the IJ's and BIA's decisions if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (internal quotation marks omitted). In making that determination, we view the record evidence in the light most favorable to the agency's decision and draw all inferences in its favor. *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (*en banc*). To reverse a factual finding, we must find that the evidence compels a contrary conclusion. *Id.*

In adjudicating an asylum application, the agency must consider all the evidence introduced by the applicant, though we do not require the agency to address specifically each claim made or each piece of evidence presented. *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1374 (11th Cir. 2006). Nevertheless, the agency must give "reasoned consideration" to the application, make "adequate findings," and announce its decision in terms sufficient to enable meaningful appellate

13

review.  *Id.* (quotation marks omitted); *see also Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1236-37 (11th Cir. 2007).

### III.

To be eligible for asylum, an applicant must show that he or she is a "refugee."  8 U.S.C. § 1158(b)(1)(A).  A "refugee" is defined as someone outside of his country of nationality "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, nationality, membership in a particular social group, or political opinion."   8 U.S.C. § 1101(a)(42)(A).

An asylum applicant's burden of proof must be met with specific and credible evidence in the record.  *Sanchez Jimenez*, 492 F.3d at 1232; *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005) (requiring "credible, direct, and specific evidence in the record" (internal quotation marks omitted)).  Proving past persecution requires showing both (1) that the applicant was persecuted and (2) that the persecution was on account of a protected ground.  *Sanchez Jimenez*, 492 F.3d at 1232; *see* 8 U.S.C. § 1158(b)(1)(B)(i) (the protected ground must be "at least one central reason" for the persecution).  Establishing past persecution creates a rebuttable presumption of a well-founded fear of future persecution.  *Forgue*, 401 F.3d at 1286.

14

In determining whether an applicant has satisfied the burden of proof, the IJ generally must "weigh the credible testimony along with other evidence of record." 8 U.S.C. § 1158(b)(1)(B)(ii).  For purposes of review, the IJ also "must make clean determinations of credibility."  *Yang v. U.S. Att'y Gen.*, 418 F.3d 1198, 1201 (11th Cir. 2005) (internal quotation marks omitted).  We defer to the IJ's credibility determinations because, among other reasons, "direct authentication or verification of an alien's testimony and/or evidence is typically very difficult and often impossible."  *Korniejew v. Ashcroft*, 371 F.3d 377, 387-88 (7th Cir. 2004) (quotation marks omitted); *see also Gjerazi v. Gonzales*, 543 F.3d 800, 809 (7th Cir. 2006).

The applicant's credible testimony may be sufficient, without corroboration, to establish eligibility for asylum.  *Tang v. U.S. Att'y Gen.*, 578 F.3d 1270, 1276-77 (11th Cir. 2009).  "The weaker an applicant's testimony, however, the greater the need for corroborative evidence."  *Yang*, 418 F.3d at 1201 (citing *Matter of Y–B–*, 21 I. & N. Dec. 1136, 1139 (BIA 1998)).  So "general and vague" testimony may require "specific and detailed corroborative evidence."  *Matter of Y–B–*, 21 I. & N. Dec. at 1139.

In the REAL ID Act of 2005, Congress enacted § 1158(b)(1)(B)(ii), which "expressly empowered the IJ to require corroborating evidence even when the applicant has provided otherwise credible testimony."  *Singh v. Holder*, 602 F.3d

15

982, 988 (9th Cir. 2010); 8 U.S.C. § 1158(b)(1)(B)(ii) ("The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee."). According to the BIA, by enacting § 1158(b)(1)(B)(ii), Congress intended to codify the BIA's corroboration standards as stated in *Matter of S–M–J–*, 21 I. & N. Dec. 722, 725-26 (BIA 1997) (*en banc*). *Matter of J–Y–C–*, 24 I. & N. Dec. 260, 263 (BIA 2007). Therefore, under the Immigration and Nationality Act as amended by the REAL ID Act, "an asylum applicant should provide documentary support for material facts which are central to his or her claim and easily subject to verification. . . . The absence of such corroborating evidence can lead to a finding that an applicant has failed to meet [his] burden of proof." *Id.* (quoting *Matter of S–M–J–*, 21 I. & N. Dec. at 725-26).

If the IJ determines that an applicant should provide evidence corroborating "otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence." 8 U.S.C. § 1158(b)(1)(B)(ii). We may not reverse the IJ's determination "with respect to the availability of corroborating evidence" unless we find that the record compels a conclusion "that such corroborating evidence is unavailable." 8 U.S.C. § 1252(b)(4).

16

To summarize the case before us, Luis testified in detail about how he was targeted, threatened on several occasions, and then kidnapped and held captive for fifteen days by self-identified members of the FARC. Luis testified that the FARC told him that the reason he was targeted and kidnapped was because he refused to stop what the FARC considered his promotion of capitalism through his teaching activities with the Avanti Foundation. According to Luis, the FARC believed that Luis's actions were detrimental to its recruitment of poor youths because he was helping them to become self-sufficient and open small businesses and turning them toward capitalism and away from the communist beliefs espoused by the FARC.

Despite finding Luis credible and "very emotional" when discussing the events, the IJ determined that it was reasonable to expect Luis to produce corroborating evidence of a nexus—that it was in fact the FARC that kidnapped him and that he was kidnapped on account of his teaching activities with the Avanti Foundation. But the IJ also noted that, had Luis established a nexus, being kidnapped and suffering for fifteen days would amount to persecution.

In reviewing the IJ's decision, the BIA rejected Luis's claim that his credible testimony was sufficient to meet his burden of proving eligibility for asylum because the IJ had authority to request further corroboration and the IJ pointed to evidence "which could have been reasonably presented," including testimony from Magnolia, police reports, medical records, or letters from family.

17

We conclude that the IJ's and the BIA's decisions on Luis's application are not sufficient to permit meaningful appellate review for at least four reasons. *Tan*, 446 F.3d at 1374.    First, we are compelled to conclude that some of the "corroborating" evidence identified by the IJ and BIA was not "available." *See* 8 U.S.C. § 1252(b)(4).    For example, the IJ and the BIA cited the lack of police reports or medical records.    Had Luis testified that he filed such reports or sought medical attention, it may have been reasonable to demand evidence of them.    But Luis testified that neither he nor Magnolia filed reports with authorities regarding the threats he received or his kidnapping, and that he did not receive medical attention for his physical injuries immediately after the kidnapping.    Nothing in the record indicates otherwise.[2]    Accordingly, the record compels a conclusion that, because Luis did not have and could not obtain police reports and medical records that do not exist, the evidence was "unavailable." *See id.*

While we recognize that the IJ's point seems to have been that the lack of existence of such corroborating evidence was problematic to Luis's claim, that leads us to our second problem:    the IJ's ambiguous credibility determination

---

[2] Luis's testimony does not reflect that he received serious physical injuries that would have required medical treatment.    Rather, his physical injuries were limited to insect bites and swelling from the lack of blood pressure medication, and he testified that his wife brought cortisone and his blood-pressure medication to the hotel.    In addition, Luis testified that he saw a psychologist after the kidnapping, and the record contains a "Psychological Certificate" signed on May 10, 2011, from a psychologist in Colombia, stating that Luis was evaluated and found to have "a severe post-traumatic stress condition," anxiety, depression, and severe emotional instability.    The IJ did not discuss this document.

makes it difficult for us as a reviewing court to determine whether the IJ thought Luis failed to carry his burden of proof because of the lack of corroboration or simply because the IJ did not find his testimony credible. *See Yang*, 418 F.3d at 1201 (citing *Iao v. Gonzalez*, 400 F.3d 530, 534 (7th Cir. 2005)). The IJ's credibility finding is ambiguous because he explicitly found Luis to be credible but, at the same time, appears to have found key portions of Luis's testimony implausible in concluding that Luis failed to satisfy his burden of proof.[3] *Cf. Todoric v. U.S. Att'y Gen.*, 621 F.3d 1318, 1324 (11th Cir. 2010) (noting that the plausibility of an applicant's story is part of the totality of the circumstances IJs must consider in determining an applicant's credibility). As a result, we are left in the dark as to whether the absent "corroborating" evidence went to verifying aspects of Luis's credible story or instead was brought up to show that the IJ did not find his testimony plausible.

Third, in narrowly focusing on the nexus requirement, the IJ appears to have unreasonably required Luis to present certain corroborating evidence that would have been impossible to obtain. The BIA has stated that "[u]nreasonable demands are not placed on an asylum applicant to present evidence to corroborate particular

---

[3] As a general matter, because the IJ did not make a clear adverse credibility determination, and indeed explicitly found Luis to be credible, we accept Luis's testimony as credible on appeal. *See Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1354 (11th Cir. 2009); *Mejia v. U.S. Att'y Gen.*, 498 F.3d 1253, 1257 (11th Cir. 2007); *see also* 8 U.S.C. § 1158(b)(1)(B)(iii).

19

experiences (*e.g.*, corroboration from the persecutor)." *Matter of S–M–J–*, 21 I. & N. Dec. at 725-26. Indeed, it is generally not possible for an asylum applicant to corroborate every aspect of his story, and it may be "frequently necessary to give the applicant the benefit of the doubt." *Id.* (quoting another source). Here, for example, the IJ found that Luis "provided no evidence that the FARC was in fact after him," such as evidence from someone with firsthand knowledge of the abduction"—other than Luis's own testimony, of course. But it is difficult to imagine how, for example, Luis's testimony that he was held captive by men wearing military uniforms and armbands identifying them as members of the FARC is susceptible to corroboration.

Finally, the IJ's authority to deny a claim based on the lack of even reasonably available corroborating evidence is not without limits. Despite the facially broad discretion § 1158(b)(1)(B)(ii) gives to IJs, we held in *Niftaliev v. U.S. Attorney General*, 504 F.3d 1211, 1217 (11th Cir. 2007), that an IJ erred in denying a petitioner's claim based on the lack of corroboration where the petitioner's credible, uncorroborated testimony alone was sufficiently detailed to compel a finding of past persecution.[4] In other words, *Niftaliev* recognizes that we review not only whether corroborating evidence was available, *see* 8 U.S.C.

---

[4] *Niftaliev* concerned withholding of removal, rather than asylum, but the same standards for burden of proof and credibility apply to both types of claims. *See* 8 U.S.C. § 1231(b)(3)(C) (incorporating 8 U.S.C. § 1158(b)(1)(B)(ii)-(iii)).

§ 1252(b)(4), but also whether corroborating evidence was necessary to support an applicant's claim, *see Niftaliev*, 504 F.3d at 1217 ("[T]his appeal does not concern whether corroborative evidence was available.  This appeal concerns whether or not the petitioner's credible testimony, in and of itself, establishes his past persecution."); *cf. Aden v. Holder*, 589 F.3d 1040, 1046 (9th Cir. 2009) (reviewing the BIA's determination as to the sufficiency of corroboration for substantial evidence).

Here, although the petitioners argued to the BIA that Luis's credible testimony, in addition to other corroborating evidence they submitted, was sufficiently detailed to establish past persecution, the BIA did not address that argument.  The BIA instead decided only that the IJ's decision was due to be affirmed because the IJ identified evidence that the petitioners could reasonably have presented in support of their claim.  The petitioners again raise the argument on appeal that Luis's credible testimony, in addition to other evidence in the record, established his eligibility for asylum.  Because the BIA has not addressed this claim directly, we conclude that "the proper course . . . is to remand to the agency for additional investigation or explanation."  *I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16, 123 S. Ct. 353, 356 (2002) (quotation marks omitted).

## IV.

For the reasons stated herein, we conclude that the IJ's and BIA's decisions with respect to Luis's failure to corroborate his asylum claim are insufficient to enable meaningful review.  *See Tan*, 446 F.3d at 1377.  We therefore grant the petition for review, vacate the IJ's and BIA's decisions, and remand for proceedings consistent with this opinion.[5]

**PETITION GRANTED.**

---

[5] Because we grant the petition, we do not address the petitioners' other arguments, including that they were entitled to notice and an opportunity to provide corroborating evidence or to explain why they cannot do so.