[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 07, 2010
JOHN LEY
CLERK

No. 09-12113

_____

Agency No. A099-554-370

LEONEL EURO AYALA,

                                                                Petitioner,

versus

U.S. ATTORNEY GENERAL,

                                                                Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(May 7, 2010)

Before PRYOR and FAY, Circuit Judges, and QUIST,* District Judge.

PRYOR, Circuit Judge:

_____

* Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

This petition for review presents the issue whether the Board of Immigration Appeals gave reasoned consideration to the application for asylum and withholding of removal of Leonel Euro Ayala, a native and citizen of Venezuela. Ayala, who is homosexual and opposes the Chavez government, alleged that he had suffered past persecution on account of his sexual orientation and political opinion. Both the Board and the immigration judge credited Ayala's testimony that in December 2004 several Venezuelan police officers assaulted him after he left a gay nightclub in Caracas. Ayala testified that the police officers hit him, robbed him, handcuffed him, detained him in a patrol car, placed a hood over his head, and forced him to perform oral sex on one of the officers. The police officers threatened to arrest Ayala for being homosexual and told Ayala "[t]hey could incarcerate [him] or plant drugs in [his] house and that was all as a result of being queer." An immigration judge denied Ayala's application for asylum and withholding of removal, and the Board affirmed the decision.

The decision of the Board is riddled with error. The Board stated that it agreed with the decision of the immigration judge that the mistreatment Ayala suffered did not rise to the level of persecution, but the immigration judge made no such ruling. The Board also found that Ayala had failed to prove that the police officers who sexually assaulted him acted on account of a protected ground, but neither the Board nor the immigration judge even mentioned the police officers'

2

slurs about Ayala's homosexuality. The Board also found that Ayala failed to prove that the government was unable to protect him even though Ayala suffered mistreatment at the hands of police officers, not private actors. Because the Board and the immigration judge failed to give reasoned consideration to Ayala's application, we grant Ayala's petition for review, vacate the decision of the Board, and remand to the Board for further proceedings.

## I. BACKGROUND

Ayala lawfully entered the United States on February 12, 2005, as a nonimmigrant visitor. Ayala's visa permitted him to remain in the United States until August 11, 2005, but Ayala remained longer than permitted. On February 8, 2006, Ayala filed an application with the Department of Homeland Security requesting asylum, withholding of removal, and relief under the Convention Against Torture.

On March 14, 2006, the Department issued Ayala a notice to appear and charged that Ayala was subject to removal because he remained in the United States for a longer period than permitted by his visa. 8 U.S.C. § 1227(a)(1)(B). At a hearing before the immigration judge, Ayala admitted the factual allegations in the notice to appear and conceded that he was subject to removal, but he resubmitted his application for asylum, withholding of removal, and relief under the Convention Against Torture. In his application, Ayala alleged that he had

3

suffered persecution on account of his political opinion and membership in a particular social group. Ayala alleged that he was persecuted by his family members, coworkers, and neighbors, as well as police officers and supporters of President Hugo Chavez. The immigration judge held a hearing on the merits of Ayala's application on August 29, 2007.

Ayala's written application and testimony at the hearing established that he is a native and citizen of Venezuela. He is homosexual, and he was diagnosed as having the human immunodeficiency virus (HIV) in 1995. Ayala was an active member of two organizations in Venezuela: Friends of Life, an organization that educates Venezuelans about HIV, and Lambda Alliance, a group that fights discrimination against "homosexuals, . . . transgenders, and bisexuals."

Ayala identified as homosexual from an early age, but he hid his sexual orientation from his family until he was about 30 years old. In 2000, Ayala's family learned about his sexual orientation from a family friend who had seen Ayala at a "[g]ay party" in Caracas. Ayala's family verbally harassed him about his sexual orientation and rejected him.

Ayala began working at a telecommunications company in Caracas in 1990, and Ayala's coworkers learned that he was homosexual in 2003, when Ayala marched in a gay pride parade that passed in front of his workplace. When Ayala returned to work the day after the parade, he discovered that some of his job

4

responsibilities had been reassigned. Ayala's coworkers verbally harassed him and left "pictures of naked women on [his] desk with rude comments and insulting notes." Ayala had never experienced any problems at work before he marched in the parade; in fact, he had been promoted several times.

Ayala complained about the discrimination to his manager, but his manager responded that Ayala would not "be able to rise within the corporation" because he "was homosexual and homosexuals [are] mentally deviated people." Ayala's manager later transferred Ayala to a different department without his consent. Ayala resigned from his position in August 2004 because he "was isolated and discriminated [against] in every sense" and felt pressured to resign. Ayala tried to find another job after he resigned from the telecommunications company, but he was unsuccessful. According to Ayala, employers in Venezuela require applicants to take an HIV test and refuse to hire applicants who test positive for HIV.

In September 2004, shortly after Ayala had resigned from his position at the telecommunications company, two of his neighbors, Franklin and Vilmania Perez, began harassing him. Mr. Perez was a director in the Bolivarian Circles, an organization that supports President Chavez, and Mr. Perez had influence with the police. The Perezes tampered with Ayala's mail and insulted him. Mr. Perez told Ayala that he "didn't want to have a queer neighbor and let alone a squallad," and he warned Ayala "to not even look at him when [he] walk[s] through the

5

hallways." Ayala testified that the term "squallad" is a derogatory term used to refer to "people who are not in line with the politics of" President Chavez. Ayala testified that he met "with members of the opposition in [his] house," and he "openly spoke against the government."

On November 20, 2004, Mr. Perez assaulted Ayala as he came out of the elevator. Mr. Perez told Ayala that "he did not want a queer living within the compounds of his living quarters," and he threw Ayala against a gate. Other residents of the apartment building soon came outside, and Ayala was able to escape to his apartment. Mr. Perez returned to his apartment "to get a weapon to kill" Ayala and started beating on his door. Ayala and other residents of the apartment building called the police, but the police never responded. Ayala never went to the police station in person to make a report.

Ayala left his apartment later that night and stayed at the apartment of a friend. Ayala never returned to his apartment; he asked a friend to retrieve his belongings, and he moved to an apartment only about five to ten minutes away by car. Ayala did not attempt to find an apartment more than five to ten minutes away from the Perezes, nor did he attempt to relocate outside of Caracas.

On December 5, 2004, a group of police officers physically and sexually assaulted Ayala as he was leaving a gay nightclub. Earlier that day, Ayala had participated in a vigil to commemorate International AIDS Day. After the vigil,

Ayala went to the nightclub to meet his friends. His friends never arrived, so Ayala left the nightclub and waited outside for a taxi. Several police officers approached Ayala. The officers "threw [him] against the wall, pointed at [him] with their weapons," and took his wallet and the money inside the wallet. When Ayala told the officers to return his money, one of the officers hit him in the stomach. When Ayala asked the officers why they were detaining him and insisted that he had done nothing wrong, the officers hit him again, handcuffed him, asked for his home address, took his identification, and put him in the patrol car. The officers "told [him] to shut up because [he] was queer and they could apply the vagrancy laws." Ayala "felt scared, very scared" and thought the officers "were going to kill" him. The officers put a hood over Ayala's head and drove him around in their car. The officers eventually removed the hood and forced Ayala to perform oral sex on one of the officers. After they forced Ayala to perform oral sex, the officers drove to "a dark place" that resembled a "marketplace of some sort" and left Ayala there. They told Ayala that "if [he] presented any kind of denouncement or report they had [his] address," and "[t]hey could incarcerate [him] or plant drugs in [his] house and that was all as a result of being queer." Ayala never reported the incident because he feared that the officers would assault him again or fulfill their threats.

On January 23, 2005, members of the Bolivarian Circles physically assaulted Ayala after he participated in a march to protest the Chavez government. Ayala testified that, during the march, he wore "a visor that had the slogan of the opposition" and "carried the slogan of the opposition." When the march ended, Ayala took the train back to his neighborhood. Members of the Bolivarian Circles approached Ayala when they saw his visor, physically assaulted him, and called him "squallad" and "queer." They took his cellular telephone, injured the left side of his face, and caused him to bleed from his elbow. Ayala reported the incident to police officers in a nearby patrol car, but they refused to help him. The officers told Ayala "that's what happened to all the squallad queers" and "[s]omething worse than that should've happened for being a member of the government opposition."

After the attack, Ayala began receiving threatening phone calls. The callers identified themselves as members of the Bolivarian Circles, said they knew where Ayala lived, and told Ayala to "look out because [he] could end up with flies in [his] mouth one morning." Ayala never reported the phone calls to the authorities because the police had mistreated him and he did not believe they would help him. Ayala decided to move to the United States soon after he began receiving the threatening calls.

Ayala now lives in Miami, where he works for a communications company. He receives free health care from a government program at a hospital in Miami. Ayala testified that, although he was able to obtain HIV medications in Venezuela until 2001, Venezuela experienced a shortage of HIV medications after 2001. Ayala denied coming to the United States to obtain better health care, but he acknowledged that he would not have access to the same quality of health care in Venezuela. Ayala also testified that he traveled to the United States for an eight-day vacation in September 2004. Ayala testified that he did not seek asylum at that time because "the situation was not as grave and [his] life was not in danger."

To support his application for asylum, withholding of removal, and relief under the Convention Against Torture, Ayala submitted several documents about conditions in Venezuela for homosexuals and political dissidents. Ayala submitted articles and reports observing that homosexuals face discrimination in Venezuela. He also submitted articles and reports describing a deterioration in the human rights situation for political dissidents in Venezuela. Specifically, Ayala submitted information from the United States Citizenship and Immigration Services Resource Information Center, which reported that the Chavez administration "has increasingly lost control of the radicals within the Bolivarian Circles and is unable to prevent those elements from attacking and killing Chavez dissidents."

Ayala also provided the immigration judge with the 2006 Venezuela Country Report on Human Rights Practices prepared by the U.S. Department of State. The Country Report stated that human rights problems in Venezuela included "unlawful killings; disappearances reportedly involving security forces; torture and abuse of detainees; . . . arbitrary arrests and detentions; [and] . . . widespread corruption at all levels of government." With respect to police forces, the Country Report stated that "corruption was a major problem among all police forces" and that "[i]mpunity, brutality, and other acts of violence were major problems." The Country Report also stated that, although the Venezuelan government ordinarily respects the right to freedom of assembly, "[g]overnment supporters sometimes disrupted marches and rallies."

At the end of Ayala's hearing before the immigration judge, the immigration judge invited the parties to submit additional evidence about discrimination by the Venezuelan government against homosexuals. The government submitted several items. Among them were newspaper reports that discrimination against homosexuals in Venezuela had declined, the Venezuelan government had allowed thousands of homosexuals to march in gay pride parades without incident, and President Chavez had stated publicly that "a big mistake had been made in 1999 during the National Constituent Assembly, when the rights of gays and lesbians were left out of the new constitution." The government also submitted a report

from the Immigration and Refugee Board of Canada, which stated that incidents of violence against homosexuals by security forces had decreased, as had discrimination against homosexuals by health centers.

The immigration judge denied Ayala's application for asylum, withholding of removal, and relief under the Convention Against Torture. The immigration judge found Ayala's testimony credible and concluded that Ayala was a member of a particular social group—that of HIV-positive homosexual men. The immigration judge nonetheless denied Ayala's application because Ayala had not established past persecution on account of a protected ground or a well-founded fear of future persecution.

The immigration judge's decision about past persecution rested on several findings. The immigration judge found that "[a]ll of the protestors, as well as the neighbors who offered some resistance to [Ayala], cannot be considered by this Court as taking actions which were inspired by government officials or acquiesced to by government officials." The immigration judge also found that there was no evidence that the Bolivarian Circles are "hostile to gay rights in Venezuela." Regarding the incident where police officers forced Ayala to perform oral sex, the immigration judge found that the incident was a "criminal act[] perpetrated by individuals" and it "d[id] not appear to be the policy or process of a legitimately established government." The immigration judge continued, "Indeed, [Ayala]

could not associate the actions of these policemen with any prejudice or discrimination extended toward gay men as a group, or toward him as an individual, as a function of municipal or national government." The immigration judge never found that the mistreatment Ayala alleged was not severe enough to constitute persecution.

As to the ruling that Ayala failed to establish a well-founded fear of future persecution, the immigration judge found that Ayala had not attempted to relocate within Venezuela and that conditions for homosexuals in Venezuela had improved during the presidency of Hugo Chavez. The immigration judge explained that "many members of the same group to which [Ayala] belonged have remained [in Venezuela] and have done so without difficulty." The immigration judge rejected the allegation that HIV-positive homosexuals are denied medical treatment and found instead that "the gay community in Venezuela is, in fact, the recipient of free medical treatment, however uneven that treatment may be."

Ayala appealed the decision of the immigration judge to the Board of Immigration Appeals. The Board affirmed the decision of the immigration judge and issued a separate opinion. The Board agreed with the immigration judge that "homosexuals make up a particular social group" and that Ayala is a member of that group, but the Board also ruled that Ayala had failed to establish past persecution on account of a protected ground. The Board, quoting Sepulveda v.

12

U.S. Attorney General, 401 F.3d 1226, 1231 (11th Cir. 2005), explained that "'persecution' is an 'extreme concept' requiring 'more than a few isolated incidents of verbal harassment or intimidation'" and "agree[d] with the Immigration Judge that the mistreatment [Ayala] described does not rise to the level of persecution." The Board also agreed with the immigration judge that there was "insufficient evidence to establish that the policemen who robbed and sexually assaulted [Ayala] were motivated to harm him on account of a protected ground," and that Ayala "failed to show the government would not protect him because he never reported the incident."

The Board also agreed with the immigration judge that Ayala had failed to prove a well-founded fear of future persecution on account of his sexual orientation, HIV status, or political opinion. The Board explained, "[T]he background evidence indicates that Venezuela's gay community is a robust group that frequently marches without disruption or disturbance, and that tolerance and respect for the gay community in Venezuela is improving." The Board also concluded that the evidence Ayala had presented did not support a finding that Ayala "would be denied medical care in Venezuela."

## II. STANDARD OF REVIEW

We review the decision of the Board and "the decision of the Immigration Judge to the extent that the Board expressly adopted the opinion of the

Immigration Judge." Kazemzadeh v. U.S. Att'y Gen., 577 F.3d 1341, 1350 (11th Cir. 2009) (internal quotation marks omitted). Because the Board explicitly agreed with several findings of the immigration judge, we review the decisions of both the Board and the immigration judge as to those issues. We review legal determinations de novo. Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1236 (11th Cir. 2006). We review administrative fact findings for substantial evidence, which is a highly deferential standard. Sanchez Jimenez v. U.S. Att'y Gen., 492 F.3d 1223, 1230 (11th Cir. 2007). Under the substantial evidence test, we must "affirm the decision of the Immigration Judge if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Silva, 448 F.3d at 1236 (internal quotation marks omitted). We "may not reweigh the evidence from scratch," and we may reverse "only when the record compels a reversal." Id. (internal quotation marks omitted).

The Board and the immigration judge are not required to "address specifically each claim the petitioner made or each piece of evidence the petitioner presented," but they must "consider the issues raised and announce [their] decision in terms sufficient to enable a reviewing court to perceive that [they] ha[ve] heard and thought and not merely reacted." Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1374 (11th Cir. 2006) (internal quotation marks omitted); see also Jean-Pierre v. U.S. Att'y Gen., 500 F.3d 1315, 1325–26 (11th Cir. 2007); Mezvrishvili v. U.S. Att'y

14

Gen., 467 F.3d 1292, 1295 (11th Cir. 2006). "When the [Board] or the Immigration Judge has failed to give reasoned consideration or make adequate findings, we remand for further proceedings because we are unable to review the decision." Mezvrishvili, 467 F.3d at 1295 (citation and internal quotation marks omitted).

## III. DISCUSSION

Ayala advances three arguments in his petition for review. First, he challenges the determination of the Board that he failed to establish past persecution on account of a protected ground. Second, he challenges the determination of the Board that he failed to establish a well-founded fear of future persecution on account of a protected ground. Third, he challenges the determination of the Board that he failed to establish an entitlement to withholding of removal. Because we conclude that the Board and the immigration judge failed to render a reasoned decision about Ayala's claim of past persecution, we vacate the decision of the Board and remand for further proceedings.

"To establish asylum based on past persecution, the applicant must prove (1) that []he was persecuted, and (2) that the persecution was on account of a protected ground." Silva, 448 F.3d at 1236. Persecution is "an extreme concept" that requires more than "[m]ere harassment" or "a few isolated incidents of verbal harassment or intimidation." Sepulveda, 401 F.3d at 1231 (alteration in original)

(internal quotation marks omitted). "The statutes governing asylum and withholding of removal protect not only against persecution by government forces, but also against persecution by non-government groups that the government cannot control . . . ." Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1257 (11th Cir. 2006).

An applicant for asylum must prove that he was persecuted on account of one of five protected grounds: "'race, religion, nationality, membership in a particular social group, or political opinion.'" Tang v. U.S. Att'y Gen., 578 F.3d 1270, 1277 (11th Cir. 2009) (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). The Board of Immigration Appeals has held that homosexuals constitute a "particular social group" within the meaning of the Immigration and Nationality Act. In re Toboso-Alfonso, 20 I. & N. Dec. 819, 822–23 (BIA 1990). An asylum applicant need not prove that the persecution is motivated entirely by a protected ground. De Santamaria v. U.S. Att'y Gen., 525 F.3d 999, 1007 (11th Cir. 2008). Instead, an applicant need only "show that the persecution is, at least in part, motivated by a protected ground." Id. (internal quotation marks omitted).

The decision of the Board about Ayala's claim of past persecution is deficient. The Board relied on an alleged finding that the immigration judge, in fact, never made. The Board also credited Ayala's testimony, but ignored the import of that credited testimony. And the Board faulted Ayala for a failure of

16

proof about an issue that is immaterial in this context. In the light of these deficiencies, we cannot meaningfully review the decision of the Board.

The analysis of the Board as to whether the mistreatment Ayala suffered rises to the level of persecution lacks "any review of the most important facts presented in this case." Jean-Pierre, 500 F.3d at 1325. Ayala testified that police officers physically assaulted him, robbed him, handcuffed him, placed him in a patrol car, put a hood over his head, and forced him to perform oral sex on one of the officers. Although this Court has not considered whether sexual assault, such as rape or forced oral sex, rises to the level of persecution, several of our sister circuits have concluded that abuse that is sexual in nature may constitute persecution. See, e.g., Haider v. Holder, 595 F.3d 276, 287–88 (6th Cir. 2010); Ndonyi v. Mukasey, 541 F.3d 702, 710 (7th Cir. 2008); Boer-Sedano v. Gonzales, 418 F.3d 1082, 1088 (9th Cir. 2005).

The Board did not explain whether the sexual assault that Ayala described rose to the level of persecution. The Board instead baldly asserted that it "agree[d] with the Immigration Judge that the mistreatment [Ayala] described does not rise to the level of persecution," but the Board described a finding the immigration judge never made. After a thorough review of the opinion of the immigration judge, we are unable to identify any ruling by the immigration judge that Ayala's mistreatment did not rise to the level of persecution, and the government conceded

17

at oral argument that the immigration judge made no such ruling. The immigration judge instead found that the police officers did not assault Ayala on account of his sexual orientation or political opinion and that the incident was not inspired by or acquiesced in by the Venezuelan government. We cannot meaningfully review the ruling of the Board when it relies entirely on a ruling that the immigration judge did not make.

The Board also failed to provide a reasoned explanation for its finding that the police officers were not motivated to harm Ayala on account of a protected ground. Based on its longstanding precedent in In re Toboso-Alfonso, 20 I. & N. Dec. at 822–23, the Board agreed with the immigration judge that homosexuals constitute a particular social group, and the government does not dispute that finding. The Board then explained, "[A]s noted by the Immigration Judge, there is insufficient evidence to establish that the policemen who robbed and sexually assaulted [Ayala] were motivated to harm him on account of a protected ground. Such criminal acts by rogue police officers are not persecution 'on account of' one of the protected grounds." The immigration judge had found that Ayala "could not associate the actions of these policemen with any prejudice or discrimination extended toward gay men as a group, or toward him as an individual" and Ayala "suffered as a result of the acts of rogue policemen and not the targeted efforts of those intent on abusing and persecuting a person with a different gender preference

18

than their own." The findings of the Board and the immigration judge are at odds with Ayala's testimony, which the immigration judge found credible. Ayala testified that the police officers assaulted him outside of a gay nightclub and told him "to shut up because [he] was queer and they could apply the vagrancy laws" and "[t]hey could incarcerate [him] or plant drugs in [his] house and that was all as a result of being queer." Neither the Board nor the immigration judge acknowledged Ayala's testimony about the police officers' motivations, much less reconciled that testimony with its finding that the police officers did not harm Ayala, at least in part, on account of his sexual orientation. See Tan, 446 F.3d at 1376.

Another of the reasons the Board provided for its conclusion that Ayala had failed to establish eligibility for asylum is "unreasonable." Id. (internal quotation marks omitted). The Board explained that Ayala had "failed to show the government would not protect him [from the police officers] because he never reported the incident." This Court has never held that an applicant for asylum who alleges that he was persecuted by an official of the government must report the persecution to the authorities to establish eligibility for asylum. The government cites our decision in Lopez v. U.S. Attorney General, 504 F.3d 1341 (11th Cir. 2007), to support its argument that Ayala had to prove that the Venezuelan government was unable or unwilling to protect him from the police officers who

19

had physically and sexually assaulted him, but the government misreads Lopez. Lopez stands for the proposition that an applicant who alleged persecution by a private actor must prove that he "is unable to avail [him]self of the protection of h[is] home country" by presenting evidence that he reported the persecution to local government authorities or that it would have been useless to do so. 504 F.3d at 1345. The applicant in Lopez alleged that she had been persecuted by the Revolutionary Armed Forces of Colombia, a violent guerilla group at war with the government, but she had not reported the persecution to Colombian authorities. Id. at 1343. We explained that, "[a]lthough the failure to report persecution to local government authorities generally is fatal to an asylum claim," the Board of Immigration Appeals had held that the reporting requirement "would be excused where the petitioner convincingly demonstrates that those authorities would have been unable or unwilling to protect her, and for that reason she could not rely on them." Id. at 1345; see also In re S-A-, 22 I. & N. Dec. 1328, 1335 (BIA 2000). In re S-A-, the decision of the Board of Immigration Appeals that we cited in Lopez, also involved persecution by a private actor. 22 I. & N. Dec. at 1335.

An applicant for asylum who alleges persecution by a private actor must prove that his home country is unable or unwilling to protect him because "[t]he statutes governing asylum and withholding of removal protect . . . against persecution by non-governmental groups that the government cannot control."

20

Ruiz, 440 F.3d at 1257 (emphasis added). It does not follow that an applicant who alleges persecution at the hands of an official of the government should be held to the same requirement, particularly when, as here, the applicant was harmed by the police—the "very agency which purports to protect him by law." Hernandez-Montiel v. INS, 225 F.3d 1084, 1097 (9th Cir. 2000) (internal quotation marks omitted), overruled on other grounds by Thomas v. Gonzales, 409 F.3d 1177 (9th Cir. 2005) (en banc). Consequently, it was unreasonable for the Board to rely on Ayala's failure to report the police officers' misconduct to support its finding that Ayala had failed to establish past persecution.

We must remand to the agency for further proceedings. Both the Board and the immigration judge failed to give "reasoned consideration . . . or make adequate findings" as to whether Ayala suffered past persecution on account of a protected ground. Mezvrishvili, 467 F.3d at 1295. In the light of that failure to render a reasoned decision, we do not address Ayala's arguments about future persecution and withholding of removal. See Tan, 446 F.3d at 1377.

## IV. CONCLUSION

We **GRANT** Ayala's petition for review, **VACATE** the decision of the Board, and **REMAND** for further proceedings.