[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-15251
Non-Argument Calendar
_____

Agency No. A206-091-422

WEI TAO LIU,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(June 1, 2017)

Before MARCUS, JORDAN and JILL PRYOR, Circuit Judges.

PER CURIAM:

Wei Tao Liu, a native and citizen of the People's Republic of China, petitions for review of the Board of Immigration Appeals' ("BIA") final order affirming the Immigration Judge's ("IJ") denial of his application for asylum, withholding of removal, and relief under the United Nations Convention against Torture ("CAT") based on religious persecution.  The IJ and BIA found Liu's testimony in support of his application to be incredible and discounted his corroborating documentation based on his failure to mention without prompting that, after he came to the United States, his brother had suffered similar persecution in China.  On appeal, Liu asserts that these determinations were based on misstatements of the record and speculative assumptions, failed to take into account the totality of the circumstances, and were unsupported by substantial evidence.  After careful review, we grant Liu's petition and remand to the BIA for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Liu's Background and Removal Proceedings

#### 1. Liu's December 2013 Credible Fear Interview

Liu entered the United States without inspection in December 2013.  That month, he submitted to a credible fear interview with an asylum officer, at which he stated that he feared returning to China because of his activities on behalf of the Christian church.  Liu gave precise details about his activities.  He first attended

2

church in November 2012 when a neighbor he referred to as Auntie Chen suggested that he go and listen to the sermons.  Church made Liu feel better, so he began to attend daily.  On March 18, 2013, at Auntie Chen's request, Liu and two other church members distributed religious flyers in their village to spread the gospel, promote the church, and invite people to join.  Police arrested Liu and one other person distributing flyers—the third fled—and took the two to the police station, where Liu was held for three days.  While he was in custody, police slapped Liu's face and asked him why he wanted to distribute flyers, which conduct they said was prohibited.  They locked him up in a very cold room, and two police officers beat him by kicking and punching him.  When Auntie Chen bailed Liu out of jail, police told him that if he distributed flyers again, his punishment would be more severe.

Liu told the asylum officer that news of his arrest was broadcast throughout the village.  A village commissioner went to Liu's house, told him he had humiliated the village, and hinted at arresting him.  As a result, Liu hid at a friend's house.  The following month, on April 20, 2013, Liu distributed flyers again and was almost arrested.  Although police pursued him, he managed to escape.

Liu stated that he feared returning to China because the village and the police knew he distributed flyers.  He feared he would be brutally beaten if he

3

returned.  The asylum officer found that Liu had a credible fear of persecution on the basis of religion.

### 2. *Liu's Asylum, Withholding of Removal, and CAT Application*

In August 2014, after the Department of Homeland Security charged Liu as removable for lacking a valid entry document (a charge Liu conceded), Liu filed an application for asylum, withholding of removal, and CAT relief based on religious persecution.  In his application, Liu repeated and elaborated upon many of the specific details he provided in his credible fear interview.  He also offered some new information.

Liu pinpointed the first time he attended church as November 24, 2012.  He recalled the March 18, 2013 distribution of flyers and added that the two church members with him were Yung Hui Liu (who was arrested with Liu) and Rui Yu Liu (who escaped).  When police questioned Liu and Yung Hui Liu about the flyers on this date, neither gave answers.  Liu repeated that he was taken to a cold room where he was beaten and kicked by two police officers.  Three days after his arrest, Liu's grandmother asked Auntie Chen to bail him out for ¥5,000.  Liu was released, but not before police threatened that he would be jailed if he distributed flyers again.  On the way home, Auntie Chen told Liu that police had shut down the church.

4

Liu also detailed the April 20, 2013 flyer distribution, in which he again was joined by Yung Hui Liu.  Both fled the police, and Liu went into hiding at his friend Ou Xing's house.  Liu hid at Ou Xing's house in Guantou Town, Fujian Province, from April to November 2013.  Liu noted that during this time, his brother Wei En Liu also lived in Guantou Town.  While Liu was in hiding, police repeatedly visited the home he had shared with his grandmother.  Police told Liu's grandmother that they knew he was distributing flyers again and threatened to intern him at a labor camp for two years.

While he was still hiding at Ou Xing's house, Auntie Chen told Liu that Yung Hui Liu had been arrested and sentenced to two years in a labor camp.  Liu feared the same fate, so in November 2013, with the help of his grandmother, he paid a smuggler for passage to the United States.  Since he has been in the United States, Liu has freely practiced his religion at the Evangelical Formosan Church in Orlando.  He often called his grandmother in China, and she told him police were still looking for him.  Liu stated that he was afraid to return to China because he feared he would be arrested and sent to a labor camp.

*3. Liu's Supporting Documentation*

Liu filed numerous documents in support of his application.  These included a "detain warrant" dated March 18, 2013, stating that Liu's local Public Security Bureau was ordered to detain him for illegally attending Christian activities and

5

distributing flyers, and noting that his detention expired three days later.  Liu filed

a certificate of release, which reiterated that he had illegally distributed Christian

flyers, and a receipt for a bail payment of ¥5,000, both dated March 21, 2013.

Liu also submitted letters in support of his application from his grandmother,

Yung Hui Liu's father, Ou Xing, and Auntie Chen.  Each of these letters

corroborated specific details in Liu's statements, including:  the date he first

attended church; the date on which he first distributed flyers and was arrested; that

he was beaten while detained; the date on which he almost was arrested a second

time; that he went into hiding from April to November 2013; and that police

searched for him while he was in hiding.

Liu submitted reports regarding country conditions in China.  The 2014

Annual Report of the Congressional-Executive Commission on China reported that

Chinese authorities continued to detain, imprison, and interfere with the religious

activities of members of Christian communities.  The 2012 International Religious

Freedom Report for China contained similar information.  The 2013 Human Rights

Report for China stated that prisoners and detainees were reported to have been

subjected to physical abuse and that forced labor remained a serious problem

wherein prisoners faced harsh and exploitative working conditions.  It recounted at

least one specific incident in Liu's home, Fujian Province, in which activists were

held for 33 hours without food and chained to a device meant to prevent them from

6

falling asleep.  Liu provided newspaper and internet articles that discussed the poor conditions of labor camps and the restrictions on religious freedom in China.

Finally, Liu submitted documentation of his religious activities since his arrival in the United States, including his baptism certification and photos of his baptism, an affidavit of a fellow church member describing his involvement with the church, and a letter from Evangelical Formosan Church of Orlando stating that he had attended the church regularly since February 23, 2014, and was baptized on December 21, 2014.

*4. Liu's March 2015 Amended Statement and Hearing Testimony*

At his hearing before the IJ, Liu filed an amended statement pertaining to his application for asylum, withholding of removal, and CAT relief.  In it, as relevant here, he added (as he had stated in his credible fear interview) that when he was hiding at Ou Xing's house his grandmother had told him that not only police, but also a village commissioner came looking for him and hinting that Liu should be arrested because his conduct was a humiliation to the village.

Liu's testimony before the IJ again retraced with precision the story of his: relationship with Auntie Chen, religious awakening, distribution of flyers, arrest and detention, threats by police, second distribution of flyers, flight from police, months of hiding, continuing threats by police, eventual smuggling to the United States, and religious activities in his new home, Orlando.  On cross-examination,

Liu was questioned about his brother, who according to Liu's application also lived in Guantou Town from April to November 2013. Liu testified that his brother did not live with him and his grandmother when Liu began going to church. Liu further testified that his brother was also a church member and, at some point in 2014 when Liu was already in the United States, had distributed religious flyers in China and was jailed for approximately three months. Liu confirmed that he was in contact with his brother, who now also resided in Orlando, was seeking asylum on religious persecution grounds, and attended Liu's Orlando church once, although he did not attend regularly and did not attend Liu's baptism.

## B. The IJ's and BIA's Decisions

### 1. The IJ's decision

The IJ denied Liu's application. After acknowledging that Liu's "testimony, for the most part, was consistent with the documents he provided and his prior statement," the IJ made an adverse credibility finding as to Liu's testimony because of the "late . . . revelation" that Liu's brother also had been distributing religious flyers, was jailed for doing so, and now resided in the United States. Appendix at 18. The IJ faulted Liu for failing to mention his brother's activities at his credible fear interview, in his asylum application, in his amended statement, or during direct examination at his hearing.

8

With respect to Liu's December 2013 credible fear interview, the IJ noted that although Liu testified that his brother was not arrested until sometime in 2014, "the timeline is not clear to the Court given the respondent's lack of overall credibility." *Id.* at 18-19. With respect to Liu's August 2014 application, the IJ surmised that "[b]y that time the Court can reasonably assume that the respondent's brother had himself been distributing flyers, had been detained for three months, and that he had fled to the United States." *Id.* at 19. For this same reason, the IJ found notable Liu's failure to mention his brother in his amended statement or on direct examination at his hearing.

The IJ observed that "[i]f the respondent's brother is in fact in the United States, the Court would fully expect that his brother would be called to testify on respondent's behalf." *Id.* at 20. Liu's "material omissions of any reference to his brother and his brother's experience and his failure to provide live testimony [from his brother], if not at least an affidavit, also calls into question his supporting documents," which made no mention of Liu's brother. *Id.* Thus, the IJ found, these supporting documents were entitled to no weight. As a result of these findings, the IJ denied Liu's application for asylum. And, because Liu could not meet his burden to demonstrate eligibility for asylum relief, he could not meet the higher burden of showing his entitlement to withholding of removal or CAT relief.

2. *The BIA's Decision*

9

Liu appealed to the BIA, which affirmed the denial of Liu's application. The BIA agreed with the IJ's adverse credibility determination, reasoning that although Liu's "testimony was relatively consistent with his prior statements," his failure to mention his brother's experience until cross-examination was sufficient to justify the determination that he was not credible. *Id.* at 6. The BIA also agreed "that the omission of any narrative concerning the respondent's brother from all of the letters submitted by the respondent's friends and family undermines the credibility of those written statements." *Id.* at 7.

Relying on the fact that "an adverse credibility determination alone can be sufficient to support a denial of asylum," the BIA affirmed the IJ's denial of asylum. The BIA also affirmed the IJ's denial of withholding of removal and CAT relief, explaining that, "[i]n the absence of independently corroborating evidence, the adverse credibility finding also precludes" Liu's requests for such relief. *Id.*

Liu petitions this Court for review.

## II. STANDARD OF REVIEW

When the BIA explicitly agrees with the findings of the IJ, we review both decisions to the extent of their agreement. *See Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 948 (11th Cir. 2010). Here, the BIA expressly agreed with the IJ's adverse credibility determination and finding that Liu's supporting documents were of no

10

value because they omitted any mention of his brother.  Thus, as to those conclusions, we review both the IJ and the BIA's findings.

We review factual findings, including credibility determinations, under the substantial evidence test.  *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1286 (11th Cir. 2005).  We will affirm findings that are "supported by reasonable, substantial, and probative evidence on the record considered as a whole," viewing "all evidence in the light most favorable to the agency's decision and draw[ing] all reasonable inferences in favor of that decision."  *Id.*  "We may not reweigh the evidence from scratch, and we may reverse only when the record compels a reversal."  *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 948 (11th Cir. 2010) (internal quotation marks omitted).

### III. DISCUSSION

On appeal, Liu asserts that the IJ's and BIA's finding that his testimony was incredible and corresponding conclusion that his supporting documents were entitled to no weight are unsupported by substantial evidence.  Thus, he argues, the denial of his petition must be vacated and his case remanded for further proceedings.  For the reasons that follow, we agree.  We first describe the relevant legal framework; then, we analyze Liu's petition within this framework.

**A. Legal Framework**

11

The Attorney General has the authority to grant asylum to a noncitizen who meets the definition of "refugee" in the Immigration and Nationality Act ("INA"). INA § 208(b)(1)(A).  A refugee is defined as:

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail him or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

*Id.* § 101(a)(42)(A).  The applicant bears the burden of proving that he is a refugee by presenting specific and credible evidence demonstrating that he (1) was persecuted in the past based on one of these five protected grounds or (2) has a well-founded fear that he will be persecuted in the future based on one of the protected grounds.  *Id.* § 208(b)(1)(B)(i); *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1257 (11th Cir. 2006).

To obtain withholding of removal, an applicant must show past persecution or a clear probability of future persecution on account of a protected ground.  *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1375 (11th Cir. 2006).  In other words, the applicant must show that it is more likely than not that he will be persecuted, which is a more stringent standard than the well-founded fear standard for asylum. *Id.*  Similarly, under CAT, the applicant for relief bears the burden of proving that it is "more likely than not that he . . . would be tortured if removed to the proposed country of removal."  8 C.F.R. § 208.16(c).

12

An applicant's testimony, if credible, may be sufficient to sustain his burden of proof to demonstrate eligibility for asylum, withholding of removal, or CAT relief without corroborating evidence. *Ruiz*, 440 F.3d at 1255. "If . . . the applicant produces other evidence of persecution, whatever form it may take, the IJ must consider that evidence, and it is not sufficient for the IJ to rely solely on an adverse credibility determination in those instances." *Forgue*, 401 F.3d at 1287. When the IJ makes an adverse credibility finding, the applicant may obtain relief in this Court only if he demonstrates either that the decision to deny his application was unsupported by "specific, cogent reasons" or that was not based on substantial evidence. *Ruiz*, 440 F.3d at 1255.

Pursuant to the REAL ID Act of 2005, Pub. L. No. 109-13, § 101, 119 Stat. 302, for applications like Liu's filed after May 11, 2005, a credibility determination may be based on the totality of the circumstances, including: (1) the applicant's demeanor, candor, and responsiveness; (2) the plausibility of the applicant's testimony; (3) the consistency between the applicant's oral and written statements, whenever made; (4) the internal consistency of each statement; (5) the consistency of the applicant's statements with other evidence in the record; and (6) any inaccuracies or falsehoods in the applicant's statements. INA § 208(b)(1)(B)(iii).

With these principles in mind, we review the merits of Liu's petition.

**B. Liu's Petition for Review**

Considering the evidence adduced in this case as a whole, we must reverse. Neither the adverse credibility determination nor the decision to discount entirely Liu's supporting documentation was supported by substantial evidence; rather, those findings were based on speculative assumptions unsupported by the record, and in some cases contradicted by it. *See Forgue*, 401 F.3d at 1287.

Liu was extremely detailed and strikingly consistent in each of his statements, whether oral or written. Each time he told his story, he recounted the same version of the events in the same order (even providing precise dates) involving the same participants. There were remarkably few differences between the several accounts Liu provided, and where there were differences—such as the fact that a village commissioner, in addition to police, had come looking for him at his grandmother's house in April 2013—Liu corrected those differences without prompting. Liu's supporting documentation independently corroborated his account of the events beginning with his attendance of church in China and continuing through his church activities in Orlando. These documents did not merely suggest that Liu was telling the truth: their detailed accounts—which matched precisely Liu's several statements—provided powerful corroborating evidence of Liu's story. Moreover, the documentary evidence Liu submitted corroborated his claim that he likely would be persecuted if he returned to China.

14

Both the IJ and the BIA acknowledged that Liu's statements were internally consistent and consistent with his documentary evidence. And at no point did either the IJ or the BIA indicate that Liu's testimony was implausible or that his demeanor suggested he may not be giving a truthful account. *See* INA § 208(b)(1)(B)(iii). In denying Liu's application, the IJ and BIA relied solely on his failure to disclose without prompting his brother's arrest and immigration to the United States. This denial was based on several assumptions, including that: (1) Liu's brother had been arrested and jailed and had left China by the time Liu gave his credible fear interview, completed his application and amended statement, and testified before the IJ; (2) Liu knew during the stages leading up to his hearing what had happened to his brother; and (3) Liu's brother's testimony would have been material to Liu's story such that its omission was a reason to deny Liu's application. These assumptions were not, however, based in evidence; rather, they were based on speculation and an inaccurate reading of the record.

The assumption that Liu's brother had been arrested and detained and then fled to the United States in time for Liu to mention these events at his credible fear interview, in his asylum application, and at his hearing, is unsupported by specific, cogent reasons or by substantial evidence. With respect to Liu's failure to mention his brother at his credible fear interview, that interview took place in 2013, and

15

there is no evidence whatsoever that Liu's brother had even been arrested at that point in time.

With respect to Liu's August 2014 application for asylum, withholding of removal, and CAT relief, Liu did in fact mention his brother. In his application, Liu stated that his brother had lived in Guantou Town until the time that Liu fled China in November 2013. The IJ simply assumed that Liu's disclosure was incomplete and omitted reference to his brother's arrest, detention, and flight from China, but this assumption was not based on any evidence. Liu testified on cross-examination at the hearing that his brother was arrested in 2014, but when Liu submitted his application, more than four months remained in 2014. So the assumption that Liu's brother had been arrested, detained for three months, *and* had arrived in the United States by August of 2014 was based on speculation alone.

Even if Liu's brother's arrest and detention had occurred by August 2014, there is no evidence from which the IJ and BIA reasonably could have concluded that Liu should have known of this fact. Liu and his brother did not live together in China, and there is no evidence suggesting that they were in contact from the time Liu immigrated to the United States until the time his brother arrived.

The only point at which the evidence indicated that Liu should have known of his brother's fate was at the March 2015 hearing (the same date on which Liu submitted an amended statement to his application). But even so, it was unclear

16

that Liu's brother's story was material to his own.  Although Liu's testimony demonstrated that he and his brother shared a similar life trajectory—they participated in the Christian church in China, distributed flyers and were detained for that activity, and sought asylum in Orlando—Liu's brother's story did not meaningfully overlap with Liu's.  The two lived separately in China; Liu's arrest, detention, hiding, and flight to the United States all occurred before his brother was arrested; and the two did not regularly attend the same church in Orlando.  To the extent Liu's brother could have provided testimony that would have aided the IJ in his decisonmaking—which is, at best, speculation—that testimony likely would have been only moderately corroborative and would have paled in comparison to the strength of the corroborating evidence Liu provided, down to arrest records stating that Liu's offense was distributing religious flyers and a receipt for the bail Auntie Chen posted for him on March 21, 2013.  For these reasons, the IJ and BIA's decision to fault Liu for failing to testify without prompting about his brother was not based on specific, cogent reasons or on substantial evidence.

Further, the record as a whole compels reversal.  As we have discussed, Liu's remarkably consistent testimony was corroborated by documentation from numerous sources.  The IJ and BIA concluded that most of this documentation was worthless because it too omitted mention of Liu's brother, but there is no evidence that any of the individuals who submitted statements in support of Liu's

17

application knew Liu's brother's experience or its relevance to Liu's application. Aside from these statements, the balance of Liu's documentary evidence indisputably corroborates his story without regard to his brother.

Thus, the decision to deny Liu's application based on an adverse credibility determination and flawed corroborating evidence was not based on substantial evidence. Rather, the record, viewed as a whole, compels that we reverse. We remand for further proceedings consistent with this opinion.

**PETITION GRANTED.**