[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-15177
Non-Argument Calendar
_____

Agency No. A205-312-051

JIAN LIN PAN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(March 2, 2021)

Before JILL PRYOR, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

Jian Lin Pan seeks review of the Board of Immigration Appeals' ("BIA") final order affirming the immigration judge's denial of his application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT"). Because substantial evidence supports the BIA's decision affirming the immigration judge's denial of such relief, we deny Pan's petition.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Pan, a native and citizen of China, entered the United States on or about May 8, 2012, through Los Angeles, California. Upon arrival, Pan was interviewed by the Department of Homeland Security ("DHS") through a Mandarin interpreter. Pan stated that he was from the Fujian Province in China, that he is married, that he has two children, and that he had fled his home country. He said that he paid a smuggler $20,000 to bring him to the United States after he had been fined in his home country for having a second child. When asked why he paid a smuggler instead of paying the fine, Pan responded that "[t]he bottom line, . . . [was] for [him] to come to the United States." He claimed that his intention in doing so was to gain employment in the United States to earn money to send back to his family. Pan also claimed that he was a Roman Catholic for "[a] few months, maybe 6 months." When asked to make the Roman Catholic sign of the cross, however, Pan was unable to do so, stating that "[i]t ha[d] been awhile" and that he was out of practice.

2

On May 23, 2012, Pan underwent a credible fear interview conducted by an asylum officer. During his credible fear interview, Pan stated that he left China on August 27, 2011, and lived in Taiwan until he flew to the United States on May 8, 2012. When questioned about why his Chinese passport indicated that he had returned to China and remained there from December 2011 to March 2012, Pan could not provide an answer. Pan also told the asylum officer that he feared returning to China because of the impending punishment for having a second child and because of his Catholic faith. Concerning his second child, he stated that his wife was sterilized after giving birth and that he too would be sentenced and sterilized if he returned. He gave conflicting dates for when his wife was sterilized, saying that the sterilization occurred on June 3, 2011, or June 6, 2011. When questioned about the discrepancy, Pan responded that he must have misspoke. After his second child's birth, Pan claimed that village officials demanded that he pay a fine of 50,000 Chinese Yuan for the illegal second birth. When he refused because he lacked the funds to pay, he claimed that the officials beat him. He then went into hiding until he could leave China.

Concerning his Catholic faith, Pan told the asylum officer that he converted to Catholicism but provided conflicting statements about when. At first, he claimed to have converted shortly before his daughter's birth, then he claimed to have become Catholic a few months into the pregnancy, and finally he claimed to have

3

converted after going into hiding. Pan claimed that, on July 3, 2011, he was arrested and detained for his attendance at a Catholic service, which his village officials called an "evil cult." When asked whether he had any problems with the Chinese government, Pan responded twice that he had no problems. But when reminded that he just conveyed several incidents involving government officials, Pan changed his answer to yes. At the conclusion of the interview, the asylum officer memorialized Pan's statements and concluded that Pan's "testimony lacked consistency both internally and externally" and that Pan's explanations for the inconsistencies, while not fully addressing the issues, did "meet the much lower standard for credibility under the credible fear standard."

In June 2012, after the full credible fear process was completed, DHS served Pan with a notice to appear, charging him as inadmissible as an alien not in possession of a valid entry document, under 8 U.S.C. § 1182(a)(7)(A)(i)(I). Pan admitted the allegations and conceded his removability as charged. Then, in May 2013, Pan applied for withholding of removal and for asylum under the Immigration and Nationality Act ("INA") and for relief under the CAT. In his application, Pan claimed that he was persecuted for violating the Chinese family planning laws and for participating in underground Catholic church activities. Because of this past persecution, Pan alleged that he feared future persecution upon return to China. He also attached the following documentary evidence.

In a written statement, Pan claimed that he and his wife went into hiding when they learned that she was pregnant with a second child. While in hiding, they were introduced to Christianity and converted to Catholicism. On June 3, 2011, his wife gave birth to their second child in a private hospital, which upon learning that the child was their second, "immediately performed the sterilization operation" on his wife. A week later, family planning officials came to Pan's home and fined him 50,000 Chinese Yuan for the second birth. When he refused to pay, he was beaten and was threatened that his continued failure to pay the fine would result in his sterilization and conviction. A few weeks later, on July 3, 2011, Pan attended a Catholic wedding service that was raided by the police. Pan claimed that he was detained and beaten by police. He was not released until his family intervened and he agreed to reporting restrictions. After initially complying with these reporting restrictions, he departed to Taiwan to flee what he feared would be future persecution for his faith and his second child. He claimed that local officials came to his home to arrest him after he fled to Taiwan and failed to report.

In a written statement, Pan's mother stated that members of an underground Catholic Church aided Pan and his wife by hiding them when Pan's wife became pregnant with their second child. While in hiding, Pan and his wife became members of the underground church. When Pan's wife gave birth, she was immediately sterilized and family planning officials came to her home and ordered police to beat

Pan "on the spot," which left Pan bloodied.  Pan's mother also relayed that Pan was arrested in the summer of 2011 for attending an underground church, during which time he was repeatedly interrogated and beaten.  Pan's mother said that Pan fled because he feared that he would be "arrested again, beaten again, and sterilized every single time."  Pan's wife also submitted a written statement, which stated the following.  On June 3, 2011, she went to a private hospital when she awoke with stomach pains.  The private hospital contacted family planning officials, who "rushed to the hospital" and required her to be sterilized immediately after she gave birth.  The hospital required her to consent to sterilization or else the doctor would refuse to deliver the child.  Having no other option, she agreed and was sterilized following the birth.

At his October 17, 2017, merits hearing, Pan testified about his home and his upbringing.  He provided contradictory statements about his siblings—he first stated that he has two sisters, then later claimed to have three siblings, and finally, after the immigration judge referred him to his asylum application, he stated that he has four older sisters.  Following this inconsistent testimony, the immigration judge warned Pan about the importance of accurate, credible, and consistent testimony.  Pan then testified about his family.  He initially claimed to have married his wife in 2015, but then stated that their marriage was on November 20, 2001.  He testified that he has two children—a son and a daughter—and that it was his daughter's birth that gave

6

rise to the events leading to his seeking asylum. Concerning the events surrounding his daughter's birth, Pan's testimony largely tracked his written statement. But his testimony regarding when his wife was sterilized and what they had to sign at the hospital contradicted his and his family members' prior statements on those events.

As to his Catholic faith, Pan initially testified that he first attended the underground church before his daughter was born, specifically stating that he attended before his wife got pregnant. But he then backtracked and stated that his first church attendance was in March 2011 while he and his wife were in hiding during her pregnancy. He stated that no one else in his family is Catholic or attended church services, but he later testified that both his wife and his son are Catholic and attend church regularly. Pan's testimony about the Catholic wedding service and his arrest on June 3, 2011, mirrored his written statement, but there were inconsistencies between his testimony and the written statements about when and how often he was beaten. Shortly after his release in August 2011, Pan testified that he left China for Taiwan, where one of his sisters lives. Pan remained in Taiwan for three months before travelling to Hong Kong for a week. He then returned to Taiwan in February 2012 and stayed there for three more months before travelling to the United States in May 2012. After he left China, authorities came to his home. Pan testified that he believes that he would be arrested if he returns to China. On cross-examination, DHS questioned Pan about the various inconsistencies throughout the statements he

made in his initial interviews, the written statements he provided, and his testimony at the hearing, including Pan's inability to show the sign of the cross, inconsistencies relating to his Catholic faith, and inconsistencies in his asylum interview.

On March 15, 2018, the immigration judge found Pan removable as charged. Additionally, because the immigration judge determined that Pan lacked credibility, he denied Pan's request for asylum, withholding of removal, and protection under the CAT.  As to Pan's credibility, the immigration judge concluded that Pan was "not credible because his testimony contained numerous inconsistencies and omissions, both internally and with the evidence of record."  Specifically, the immigration judge found that Pan had great difficulty in testifying consistently about basic biographical facts about himself, including the date of his marriage, how many siblings he has, and the date that he left China, and that he failed to adequately explain the inconsistencies.  The immigration judge also found that Pan was inconsistent about his Catholic faith, such as being unable to identify when he began practicing Catholicism and being unable to show the sign of the cross.  The immigration judge further found unreliable Pan's later contradictory statements that he had difficulty in understanding the various translators provided to him as excuses for contradictions in his statements.  And the immigration judge found that Pan's corroborating evidence—the written statements from him, his mother, and his wife—failed to cure the many issues and contradictions in his statements.  The

8

immigration judge explained that they contained inconsistencies and were "suspicious" because they were "substantially similar in form, structure, and vocabulary," indicating they were written by the same person. Because of these inconsistencies, the immigration judge found Pan was not credible and denied his application for asylum, withholding of removal, and CAT protection and ordered him removed to China.

Pan appealed the immigration judge's determination to the BIA. On December 4, 2019, the BIA dismissed the appeal, finding that the immigration judge's adverse credibility determination was not clearly erroneous. The BIA highlighted various inconsistencies that made Pan's credibility suspect, including statements made relating to Pan's Catholic faith, statements made about issues with the Chinese government, and statements relating to the events that followed his second child's birth. Pan timely petitioned this Court for review.

## II.    STANDARD OF REVIEW

We review only the decision of the BIA, except to the extent that the BIA expressly adopts or explicitly agrees with the immigration judge's opinion. *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 947–48 (11th Cir. 2010). Here, we review both the immigration judge's and the BIA's decisions as they relate to the credibility finding. *Id.*

We review credibility determinations under the highly deferential substantial

evidence standard. *Chen v. U.S. Att'y Gen.*, 463 F.3d 1228, 1230–31 (11th Cir. 2006). "The trier of fact must determine credibility, and [we] may not substitute [our] judgment for that of the BIA with respect to credibility findings." *D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 818 (11th Cir. 2004); *see also* 8 U.S.C. § 1252(b)(4)(D). Under the substantial evidence test, we must affirm the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Adefemi v. Ashcroft*, 386 F.3d 1022, 1026–27 (11th Cir. 2004). "[W]e view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Id.* at 1027. "[T]he mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the [agency's] findings." *Id.* Indeed, we will reverse the immigration judge's credibility findings "only if the evidence 'compels' a reasonable fact finder to find otherwise." *Chen*, 463 F.3d at 1230–31 (quoting *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1230 (11th Cir. 2005)).

## III.  ANALYSIS

Pan argues that the BIA erred in affirming the immigration judge's adverse credibility determination. We disagree.

An alien who arrives in the United States may apply for asylum. *D-Muhumed*, 388 F.3d at 818. To qualify for asylum, an alien must be a "refugee" within the

10

meaning of 8 U.S.C. § 1101(a)(42)(A).    8 U.S.C. § 1158(b)(1).    Under §

1101(a)(42)(A), a "refugee" is defined, in relevant part, as

> any person who is outside any country of such person's nationality or,
> in the case of a person having no nationality, is outside any country in
> which such person last habitually resided, and who is unable or
> unwilling to return to, and is unable or unwilling to avail himself or
> herself of the protection of, that country because of persecution or a
> well-founded fear of persecution on account of race, religion,
> nationality, membership in a particular social group, or political
> opinion . . . .

  "The asylum applicant carries the burden of proving statutory 'refugee' status." *D-*

*Muhumed*, 388 F.3d at 818.  To establish asylum eligibility, "the alien must establish

a 'well-founded fear' that his or her [race, religion, nationality, membership in a

particular social group, or political opinion] will cause harm or suffering that rises

to the level of 'persecution.'" *Id.*  "Establishing a history of past persecution creates

a presumption that an alien has a well-founded fear of future persecution, although

that presumption can be rebutted by the government." *Forgue v. U.S. Att'y Gen.*,

401 F.3d 1282, 1286 (11th Cir. 2005).

An asylum applicant must establish eligibility for asylum by offering

"credible, direct, and specific evidence in the record." *Id.* at 1287 (quoting *Sangha*

*v. INS*, 103 F.3d 1482, 1487 (9th Cir. 1997)).  If found to be credible, an applicant's

testimony, even if uncorroborated, may be sufficient on its own to establish

eligibility.  *Forgue*, 401 F.3d at 1287; *D-Muhumed*, 388 F.3d at 818–19.

Conversely, if the applicant is found not credible, an adverse-credibility

11

determination may be sufficient to support the denial of such a claim. *Forgue*, 401 F.3d at 1287. But even if an alien is found to be not credible, the immigration judge has a duty to consider all other evidence produced by an asylum applicant. *Id.* "Once an adverse credibility finding is made, the burden is on the applicant alien to show that the [immigration judge's] credibility decision was not supported by 'specific, cogent reasons' or was not based on substantial evidence." *Id.* (quoting *D-Muhumed*, 388 F.3d at 819).

Here, we find that substantial evidence supports the BIA's opinion affirming the immigration judge's finding that Pan's testimony was not credible based on the inconsistencies within his testimony and between his testimony and the record, including his application, sworn statement, credible fear interview, and the corroborating evidence he submitted. The BIA and the immigration judge provided specific and cogent reasons for the adverse credibility determination, which is supported by substantial evidence. And nothing in the record compels the opposite conclusion.

As highlighted by the BIA and the immigration judge, several inconsistencies existed that cast doubt on Pan's claims. First, there were inconsistencies in Pan's testimony related to his Catholic faith, such as giving differing dates as to when he converted to Catholicism and differing answers as to whether any of his family was also Catholic and attended church. Pan's credibility as to the statements made about

12

his faith was further undermined when he was unable to show border officials the Catholic sign of the cross. Second, there were contradictions in Pan's testimony and the other record evidence relating to his July 3, 2011, arrest. In his credible fear interview, Pan did not claim to have been interrogated or beaten while detained. At his merits hearing, Pan testified that he was beaten once, and his mother's statement claimed that he was beaten frequently. And Pan gave conflicting testimony about whether he had faced any issues with the Chinese government, answering that he had not when just describing issues with government officials.

Third, Pan provided conflicting testimony about the events surrounding his wife's sterilization after giving birth. He provided different dates for when the procedure was done and was inconsistent and nonresponsive about the alleged form they were required to sign and its purpose. Finally, the record contains various inconsistencies related to basic information about Pan and his life. He provided different dates for his marriage and different numbers for how many siblings he has, i.e., initially claiming to have two sisters, then changing that figure to three sisters, before settling on four sisters. There were further inconsistencies and omissions related to Pan's financial means—Pan claimed to be unable to afford the 50,000 Chinese Yuan fine—equivalent to about $8,000—but he then claimed to have paid a smuggler $20,000 to get him out of China. He also failed to provide a coherent timeline for the period from when he left his hometown in China to when he arrived

in the United States. And Pan offered no sufficient explanation nor sufficient corroborative evidence to cure these inconsistencies and omissions. *See Chen*, 463 F.3d at 1233. The record supports the BIA and immigration judge's adverse credibility determination. We therefore deny Pan's petition.

As to Pan's claim of withholding of removal, we find that "he cannot show that his life or freedom would 'more likely than not' be threatened or persecuted upon return to his country." *D-Muhumed*, 388 F.3d at 819 (quoting *Mendoza v. U.S. Att'y Gen.*, 327 F.3d 1283, 1287 (11th Cir. 2003)); *accord* 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 208.16(b)). This standard for withholding of removal is more stringent than the "well-founded fear" standard for asylum. *D-Muhumed*, 388 F.3d at 819. As such, because Pan cannot meet the standard for asylum, he cannot meet the withholding of removal standard. *See id.*

We likewise find that Pan cannot meet the standard for CAT protection. In making out a claim under CAT, "[t]he burden of proof is on the applicant . . . to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). In turn, "torture" is defined as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind,

14

when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

*Id.* § 208.18(a)(1).  Like with the withholding of removal standard, the burden to establish "torture" for CAT protection is higher than the burden to establish a "well-founded fear" of future persecution for asylum.  *See Lapaix v. U.S. Att'y Gen.*, 605 F.3d 1138, 1145 (11th Cir. 2010); *see also* 8 C.F.R. § 208.16(c)(2).  Because Pan failed to demonstrate a "well-founded fear of persecution" sufficient to support his asylum claim, he likewise cannot establish "torture" sufficient to warrant relief under CAT.

## IV.    CONCLUSION

Because there is substantial evidence to support the BIA's decision affirming the immigration judge's adverse-credibility determination, we deny Pan's petition for review.

**PETITION DENIED.**